**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 22, 2022**

# In the Court of Appeals of Georgia

A22A1130. CROWE v. SCISSOM et al.

BARNES, Presiding Judge.

In this case involving a dispute over an owner-financed real estate transaction, the plaintiff, Michael L. Crowe, appeals from the trial court's order granting summary judgment in favor of the defendants, Claude T. Scissom and Martha Scissom. On appeal, Crowe contends that the trial court erred in granting summary judgment on his claims under the Georgia Fair Lending Act, OCGA § 7-6A-1 et seq. ("GAFLA") because the court misconstrued the statutory definitions of "creditor" and "home loan" and there were genuine issues of material fact as to whether those definitions were met in this case. Crowe also contends that the trial court erred in granting summary judgment on his claims for breach of warranty in light of the evidence he presented about certain easements he discovered on his property. For the reasons

discussed more fully below, we affirm in part, reverse in part, vacate in part, and remand the case to the trial court with direction.

> Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. In evaluating whether summary judgment is proper, the evidence and all reasonable inferences drawn therefrom must be construed in the light most favorable to the nonmovant. We conduct a de novo review of a grant of summary judgment.

(Citations and punctuation omitted.) *Moran v. Team Elite Realty*, 361 Ga. App. 329, 329 (864 SE2d 165) (2021).

So viewed, the record shows that the Scissoms owned certain lakefront property in Union County, Georgia ("Property"). The Property consisted of 1.41 acres and included a single-family house. In February 2014, Crowe entered into an agreement to purchase the Property from the Scissoms for $375,000, and the closing on the sale occurred in March 2014. Crowe made a $10,000 down payment, and the Scissoms owner-financed the remainder of the purchase price over 12 years.

Pursuant to the owner-financed loan transaction, Crowe executed a promissory note in the principal amount of $365,000 ("Note") and a deed to secure debt in favor of the Scissoms. The Note required Crowe to make monthly interest payments, with

2

interest accruing at a six percent annual rate for the first five years and an adjustable annual rate between six and eight percent for the next seven years. The Note also required Crowe to make ten payments of principal on certain dates, followed by a final balloon payment in April 2026. The Note included a three percent prepayment penalty on the unpaid principal balance if the debt was paid in full before five years had elapsed, a five percent penalty on payments received ten days after the due date, and attorney fees in the amount of fifteen percent of the principal and interest if the Note was collected by law. Additionally, if Crowe defaulted on any payment, the Note authorized the Scissoms to increase the interest rate on the unpaid principal balance to 12 percent per year and to declare the entire unpaid principal balance due and payable.

When Crowe purchased the Property, he was married and lived with his family in Paulding County. But in March 2014, upon the closing on the sale of the Property, Crowe began living at the house on the Property four days a week. Crowe's longterm plan was to retire there. In October 2015, Crowe and his wife separated, and Crowe began living at the Property full time. However, in 2018, Crowe's wife stayed at the Property for several months while Crowe stayed in a houseboat on a different lake. Ultimately, Crowe moved into the houseboat permanently.

When Crowe initially purchased the Property, he planned to subdivide the acreage so that he could use a portion of it to build another house where his parents could live or that he could rent for additional income. However, after the closing, Crowe discovered a sewer line and other easements on the Property that were not referenced in the general warranty deed or disclosed by the Scissoms and that made it difficult to subdivide the Property. Following that discovery, Crowe decided not to pursue his plan to subdivide the acreage and build a house there, and he never obtained any rental or other income from the Property.

Between 2014 and 2017, Crowe's payments on the Note totaled $80,500, but he missed over 20 payments. In November 2017, Crowe's wife filed for divorce, and Crowe subsequently informed the Scissoms about the pending divorce and requested the payoff amount for the Note. A dispute arose over the payoff amount, and Crowe stopped making any payments on the Note. The Scissoms accelerated the maturity of the Note, declared the entire outstanding balance due and payable, charged Crowe 12 percent interest on the outstanding balance, and initiated foreclosure proceedings on the Property. In July 2019, the Scissoms conducted a nonjudicial foreclosure sale during which they repurchased the Property, and they thereafter sought and obtained

a superior court order confirming and approving the foreclosure sale. In April 2021, the Scissoms sold the Property to other buyers.

In January 2020, Crowe filed the instant action against the Scissoms seeking actual and special damages, punitive damages, and attorney fees.[1] Crowe alleged in his complaint that the terms of the Note constituted a "high-cost home loan" under GAFLA, that the Scissoms were "creditors" under the statute, and that the Scissoms were liable for ten statutory violations. Crowe also asserted claims for breach of warranty and fraud based on the easements he discovered on the Property. The Scissoms answered, denying liability, and asserted counterclaims for entry of a deficiency judgment, late payment fees, interest, recovery of costs incurred in obtaining insurance and paying pre-sale taxes, and attorney fees.

Following discovery, the Scissoms moved for summary judgment on Crowe's claims,[2] and after conducting a hearing, the trial court granted the motion. Crow now

---

[1] Crowe filed his original action against the Scissoms in November 2018 and filed a voluntary dismissal in November 2019. The Scissoms asserted various counterclaims against Crowe in the original action and voluntarily dismissed some of them, leaving some of their counterclaims still pending in that action. The current status of those remaining counterclaims filed in the original action is unclear from the record and is not before us.

[2] The Scissoms also moved for summary judgment on their counterclaims, but the trial court concluded that there were genuine issues of material fact regarding the

appeals from the trial court's summary judgment order, challenging the dismissal of his GAFLA and breach-of-warranty claims.[3]

1. *The GAFLA Claims.* We first address Crowe's contention that the trial court erred in granting summary judgment in favor of the Scissoms on his GAFLA claims.

GAFLA protects consumers from certain abusive lending practices associated with home loans. See OCGA §§ 7-6A-3, 7-6A-4, 7-6A-5.[4] Under GAFLA, "high-cost

---

amount owed by Crowe that precluded summary judgment on the counterclaims and denied their motion in that respect. The Scissoms have not filed a cross-appeal challenging the trial court's denial of their motion for summary judgment on their counterclaims.

[3] Because Crowe does not challenge the trial court's grant of summary judgment on his fraud claim, he has abandoned any challenge to the dismissal of that claim. See *Dagne v. Schroeder*, 336 Ga. App. 36, 41 (3) (783 SE2d 426) (2016) ("Matters not enumerated as error will not be considered on appeal and are therefore presumed to be binding and correct.") (citations and punctuation omitted); *Weathers v. Dieniahmar Music*, 337 Ga. App. 816, 817, n. 3 (788 SE2d 852) (2016) (appellant abandoned any challenge to the dismissal of certain claims by the trial court, where he did not contest their dismissal on appeal).

[4] See generally Tucker Barr, *Banking and Finance: Georgia Fair Lending Act: Amend the Georgia Fair Lending Act; Provide for Changes in Limitations on Late Payment Charges; Clarify that Certain Home Loan Refinancing Shall Not Be Presumed to Be a Flipping; Specify When and Against Whom a Borrower May Assert Claims and Defenses for Violations of the Act; Provide for Limits on Liability for Violations of the Act Under Certain Circumstances; Provide the Department of Banking and Finance with Express Authority to Promulgate Rules and Regulations; Provide for Good Faith Reliance on Guidance from the Department of Banking and Finance*, 20 Ga. St. U. L. Rev. 1 (2003).

home loans" are subject to particular limitations and prohibitions. See OCGA § 7-6A-5. And any "creditor" who is "found by a preponderance of the evidence to have violated [GAFLA] shall be liable to the borrower" for actual, statutory, and punitive damages and for reasonable attorney fees and costs. OCGA § 7-6A-7 (a).

In their motion for summary judgment, the Scissoms argued that Crowe could not succeed on his GAFLA claims because the uncontroverted evidence showed that neither of them met the statutory definition of a "creditor" and that the loan they extended to Crowe did not meet the statutory definition of a "home loan." GAFLA defines "creditor" as

> *a person who both regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments and is a person to whom the debt arising from the home loan transaction is initially payable.* Creditor shall also mean any person brokering a home loan, which shall include any person who directly or indirectly for compensation solicits, processes, places, or negotiates home loans for others or offers to solicit, process, place, or negotiate home loans for others or who closes home loans which may be in the person's own name with funds provided by others and which loans are thereafter assigned to the person providing the funding of such loans, provided that creditor shall not include a person who is an attorney providing legal services in association with the closing of a home loan. A creditor shall not include: (A) a servicer; (B) an assignee; (C) a

7

purchaser; or (D) any state or local housing finance agency or any other state or local governmental or quasi-governmental entity.

(Emphasis supplied.) OCGA § 7-6A-2 (6). GAFLA defines "home loan" in part as

a loan, including an open-end credit plan where the principal amount does not exceed the conforming loan size limit for a single-family dwelling as established by the Federal National Mortgage Association and the loan is secured by a mortgage, security deed, or deed to secure debt on real estate located in this state upon which there is located or there is to be located a structure or structures, including a manufactured home, designed principally for occupancy of from one to four families *and which is or will be occupied by a borrower as the borrower's principal dwelling, except that home loan shall not include: . . . A loan primarily for business, agricultural, or commercial purposes.*

(Emphasis supplied.) OCGA § 7-6A-2 (8) (F).

In granting summary judgment to the Scissoms on Crowe's GAFLA claims, the trial court determined that neither of the Scissoms met the statutory definition of a "creditor" because neither "regularly extends consumer credit." The trial court reasoned that while GAFLA does not define the phrase "regularly extends consumer credit," GAFLA "is aimed squarely at home lenders and loan brokers," and there was no evidence that the Scissoms "regularly or frequently engaged in making home loans." The trial court further noted that the phrase "regularly extends consumer

8

credit" is defined in 12 CFR § 1026.2 (a) (17) (v) of Regulation Z, which was promulgated under the federal Truth in Lending Act, 15 USC § 1601 et seq. ("TILA"), as follows:

> A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of [12 CFR] § 1026.32)[5] more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of [12 CFR] § 1026.32 or one or more such credit extensions through a mortgage broker.

The trial court then applied the definition of "regularly extends consumer credit" found in 12 CFR § 1026.2 (a) (17) (v) "by analogy" and found that there was no evidence that the Scissoms satisfied it.

The trial court also determined that the loan that the Scissoms extended to Crowe did not meet the definition of a "home loan" found in OCGA § 7-6A-2 (8). Specifically, the trial court determined that the uncontroverted evidence showed that

---

[5] 12 CFR § 1026.32 defines high-cost mortgages and sets out certain requirements for such mortgages.

9

the Property was not Crowe's domicile or principal residence and that he therefore did not occupy the house on the Property as his "principal dwelling." The trial court further found that the uncontroverted evidence showed that Crowe bought the Property "with the goal of developing and dividing [it] to create income and for profit." Consequently, the trial court concluded that the loan extended to Crowe was not a "home loan" under GAFLA.

(a) *The Definition of "Creditor."* Crowe argues that the trial court erred in the manner in which it defined "creditor" under OCGA § 7-6A-2 (6) and in determining that he failed to present evidence sufficient to create a genuine issue of material fact as to whether the Scissoms met that statutory definition. Crowe raises more than one argument in this respect, and we will address each in turn.

(i) Crowe first argues that the trial court erred in concluding that he was required to show that the Scissoms "regularly extend[ ] consumer credit" to satisfy the statutory definition of a "creditor." In this regard, Crowe maintains that a "creditor" under the first sentence of OCGA § 7-6A-2 (6) should be construed to mean "a person who regularly extends consumer credit that is subject to a finance charge and is the person to whom the debt arising from the home loan transaction is initially payable," *or* "a person who is payable by written agreement in more than four

10

installments and is the person to whom the debt arising from the home loan transaction is initially payable." In other words, Crowe contends that the phrase "payable by written agreement in more than four installments" modifies "person" rather than "credit" in the first sentence of OCGA § 7-6A-2 (6). We disagree with Crowe's construction of the relevant sentence.

> When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Consequently, courts sometimes refer to the rules of English grammar, inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words, and the legislature is presumed to know the rules of grammar. Applying these principles, if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

(Citations, footnote, and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). "[T]he interpretation of a statute is a question of law, which is reviewed de novo on appeal." (Citation and punctuation omitted.) *Kemp v. Kemp*, 337 Ga. App. 627, 632 (788 SE2d 517) (2016).

Applying the aforementioned interpretive principles, we conclude that "creditor" as defined in the first sentence of OCGA § 7-6A-2 (6) "naturally and reasonably admits of only one meaning, and it is not the one [advocated by Crowe]." *Deal*, 294 Ga. at 173 (1) (a). As noted above, the term "creditor" is defined in the first sentence of the statute as "a person who both regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments and is a person to whom the debt arising from the home loan transaction is initially payable." OCGA § 7-6A-2 (6). The phrase "payable by written agreement in more than four installments" is linked to the phrase "subject to a finance charge" by the coordinating conjunction "or." See *AFLAC v. Chubb & Sons*, 260 Ga. App. 306, 308 (1), n. 2 (581 SE2d 317) (2003) (noting that "or" serves as a coordinating conjunction). Coordinating conjunctions "join[ ] two elements of identical construction and of equal grammatical rank." Bryan A. Garner, Modern English Usage 997 (4th ed. 2016). See *AFLAC*, 260 Ga. App. at 308 (1), n. 2. Nouns or phrases "joined by coordinating conjunctions are usually treated as a single, compounded unit." *ConocoPhillips Co. v. U.S. E.P.A.*, 612 F3d 822, 839 (III) (B) (2) (a) (i) (5th Cir. 2010) (citing Sidney Greenbaum, Oxford English Grammar 233 (1996)). See *South Carolina Public Svc. Auth. v. FERC*, 762 F3d 41, 61 (II) (B) (D.C.

Cir. 2014) (per curiam); *RealPage v. Enterprise Risk Control*, No. 4:16-CV-00737, 2017 U.S. Dist. LEXIS 122004, at \*16-17 (A) (1) (a) (E.D. Tex. Aug. 3, 2017). The phrases "subject to a finance charge" and "payable by written agreement in more than four installments" therefore are properly treated as a single unit that should be read together. See id. See also *AFLAC*, 260 Ga. App. at 308 (1).

The next question we must answer is whether the clause "that is subject to a finance charge or is payable by written agreement in more than four installments" modifies "person" or "credit." We conclude that, construed as a single unit and under the applicable rules of grammar, the clause modifies the immediately preceding noun, "credit," rather than the more remote noun, "person." The word "that" is a relative pronoun. See Garner, supra, at 1026 ("The relative pronouns are who, whom, that, and which.") (emphasis omitted). A relative pronoun "join[s] a clause with its antecedent." Id. See id. at 989 (defining an "antecedent" as a "noun or noun phrase to which . . . a relative pronoun . . . refers"). And a relative pronoun "generally refers to the nearest reasonable antecedent." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 144 (1st ed 2012). See Bryan A. Garner, Garner's Dictionary of Legal Usage 769 (3rd ed 2011) (noting that a relative pronoun should "immediately follow the noun that it modifies"). The nearest reasonable

13

antecedent in the statutory sentence at issue is "credit," and thus the clause "that is subject to a finance charge or is payable by written agreement in more than four installments" can only be reasonably understood as modifying that noun. Accordingly, a "creditor" under the first sentence of OCGA § 7-6A-2 (6) is a person who (a) regularly extends consumer credit that (i) is subject to a finance charge or (ii) is payable by written agreement in more than four installments.[6] The trial court therefore properly concluded that Crowe had to show that the Scissoms "regularly extend[ ] consumer credit" to satisfy GAFLA's definition of a "creditor."

---

[6] As previously indicated, there is a second prong to the definition of "creditor" in the first sentence of OCGA § 7-6A-2 (6), namely, that the party be "a person to whom the debt arising from the home loan transaction is initially payable." That there are two separate "prongs" to the definition of "creditor" is reflected by the use of the correlative conjunctions both/and contained in the pertinent statutory sentence. See *And*, Merriam-Webster's Online Dictionary (last visited July 7, 2022), https://www.merriam-webster.com/dictionary/and (defining "and" as "a function word to indicate . . . addition especially of items within the same class or type"); *Both*, Merriam-Webster's Online Dictionary (last visited July 7, 2022), https://www.merriam-webster.com/dictionary/both (explaining that "both," when part of a conjunction, is "used as a function word to indicate and stress the inclusion of each of two or more things specified by coordinated words, phrases, or clauses"); William Strunk, Jr. & E. B. White, The Elements of Style 91 (4th ed. 2000) (noting that "both, and" are "correlative conjunctions"). See also *Crooks v. Harrelson*, 282 U.S. 55, 58 (51 SCt 49, 75 LEd 156) (1930) (interpreting "and" between two phrases in a statute to mean "not one or the other, but both"). The second prong is not at issue in this case.

14

(ii) Crowe also contends that the trial court misconstrued and improperly restricted the meaning of the phrase "regularly extends consumer credit." On this point, we agree with Crowe.

The phrase "regularly extends consumer credit" is not defined in OCGA § 7-6A-2 (6), and therefore "we must assume that the legislature intended the ordinary meaning of those words to apply." *ADC Constr. Co. v. Hall*, 191 Ga. App. 33, 33 (1) (381 SE2d 76) (1989). See OCGA § 1-3-1 (b); *Couch v. Red Roof Inns*, 291 Ga. 359, 364 (1) (729 SE2d 378) (2012) (reciting that when a word "is not defined in a statute, the basic rule used by courts across the country is to apply the word's ordinary, everyday meaning"). And "[t]his Court has long recognized that dictionaries may supply the plain and ordinary meaning of a word." (Citation and punctuation omitted.) *Capital Color Printing v. Ahern*, 291 Ga. App. 101, 107 (1) (661 SE2d 578) (2008). The Oxford English Dictionary Online offers several definitions of "regularly," the most relevant being: "At fixed times or uniform intervals; repeatedly; without interruption; frequently, often." *Regularly*, Oxford English Dictionary Online (last visited July 7, 2022), https://www.oed.com/view/Entry/161419? redirectedFrom=regularly#eid. Merriam-Webster's Online Dictionary defines "regularly" in pertinent part as "on a regular basis: at regular intervals," and "regular"

15

in relevant part as "recurring, attending, or functioning at fixed, uniform, or normal intervals." See *Regularly*, Merriam-Webster's Online Dictionary (last visited July 7, 2022), https://www.merriam-webster.com/dictionary/regularly; *Regular*, Merriam-Webster's Online Dictionary (last visited July 7, 2022), https://www.merriam-webster.com/dictionary/regular. Taking into account these definitions, we conclude that read in context, a person who "regularly extends consumer credit" is a person who extends credit to consumers on a frequent, recurring basis. Hence, to meet the definition of "creditor" under OCGA § 7-6A-2 (6), a plaintiff must point to evidence showing that the defendant is a person who on a frequent and recurring basis extends consumer credit that is (i) subject to a finance charge or (ii) payable by written agreement in more than four installments.[7]

In its summary judgment order, the trial court construed "regularly extends consumer credit" more narrowly as referring to a person who engages regularly or frequently in making *home loans*. But OCGA § 7-6A-2 (6) refers to the regular extension of "consumer credit" without limiting that term to extensions of credit to consumers for the purchase of goods, services, or property. And we decline to define

_____

[7] As noted above, there is a second prong to the definition of "creditor" that is not at issue in this case. See supra footnote 6.

16

the term "consumer credit" more restrictively as referring only to the regular extension of home loans to consumers, given that it is well-established that "we will not engraft onto . .. [the] statute a heretofore unstated limitation." *Herring v. Rabun Trucking Co.*, 147 Ga. App. 713, 714 (250 SE2d 167) (1978). See *Moosa Co. v. Commr. of Ga. Dept. of Revenue*, 353 Ga. App. 429, 432 (838 SE2d 108) (2020) (noting that "this [C]ourt cannot add language to a statute by judicial decree") (citation and punctuation omitted); *Tolson v. Sistrunk*, 332 Ga. App. 324, 329 (1) (772 SE2d 416) (2015) ("[C]ourts may not constrict a subsection of [a] statute by engrafting upon it limitations the legislature has not enacted.") (citation and punctuation omitted). Indeed, the legislature used the words "home loan" or "home loans" several times in OCGA § 7-6A-2 (6), and "[w]here the legislature uses different terms in the same statute, we generally assume that different meanings were intended for those terms." (Citation and punctuation omitted.) *Weyer v. State*, 333 Ga. App. 706, 711 (1) (b) (776 SE2d 304) (2015). Consequently, we decline to construe "consumer credit" as synonymous with "home loans," and the trial court erred in concluding otherwise.

Additionally, the trial court analogized and relied upon the definition of "regularly extends consumer credit" found in 12 CFR § 1026.2 (a) (17) (v) in

17

determining the meaning of that phrase in OCGA § 7-6A-2 (6). However, the definitions of several other terms contained in OCGA § 7-6A-2 expressly incorporate definitions from federal statutes or regulations. See OCGA § 7-6A-2 (2), (3), (10), (12) (A), (12) (B), (12) (G) (ii), (12) (G) (iv), (15), (16), (17) (A), (18). The definitions of these terms illustrate that when the General Assembly chose to incorporate a definition from a federal statute or regulation into OCGA § 7-6A-2, it knew how to do so, and we must presume that its failure to incorporate such a definition into OCGA § 7-6A-2 (6) "was a matter of considered choice." *Transportation Ins. Co. v. El Chico Restaurants*, 271 Ga. 774, 776 (524 SE2d 486) (1999). See *Bauerband v. Jackson County*, 278 Ga. 222, 225-226 (3) (598 SE2d 444) (2004) (concluding that legislature's use of the words "sums payable in the individual calendar year renewal term" and "annual payments" elsewhere in the statute showed that, "had the General Assembly wished to require that future obligations be set forth as a sum certain [in the provision at issue], it knew how to accomplish that"); *Avila v. State*, 333 Ga. App. 66, 69-70 (775 SE2d 552) (2015) (noting that General Assembly's use of the phrase "during the commission of the offense" in certain subsections of a criminal statute made "clear that the legislature knew how to specify that the disqualifying event must occur while the crime was in process," but that the

18

subsection at issue did not contain such language). The trial court therefore erred in relying on the definition of "regularly extends consumer credit" contained in 12 CFR § 1026.2 (a) (17) (v).

In moving for summary judgment, the Scissoms also argued that in construing OCGA § 7-6A-2 (6), the trial court ought to apply the definition of "regularly extends consumer credit" found in OCGA § 43-39A-2 (32) of the Real Estate Appraiser and Real Estate Appraisal Management Company Classification and Regulation Act, OCGA § 43-39A-1 et seq. ("Real Estate Appraiser Act"), which is similar to but not identical to the definition found in 12 CFR § 1026.2 (a) (17) (v). OCGA § 43-39A-2 (32) provides:

> "Regularly extends consumer credit" means: (A) Extending credit (other than credit subject to the requirements of 12 CFR 1026.32) more than five times for transactions secured by a dwelling in the preceding calendar year; (B) Extending credit (other than credit subject to the requirements of 12 CFR 1026.32) more than five times for transactions secured by a dwelling in the current calendar year if credit was not extended more than five times in the preceding calendar year; or (C) Originating in a 12 month period more than one credit extension that is subject to the requirements of 12 CFR 1026.32 or one or more such credit extensions through a mortgage broker.

19

The Scissoms's reliance on the definition of "regularly extends consumer credit" found in OCGA § 43-39A-2 (32) of the Real Estate Appraiser Act is misplaced. It is true that "a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes in pari materia, are construed together, and harmonized whenever possible, so as to ascertain the legislative intendment and give effect thereto." (Citation and punctuation omitted.) *Iglesia Del Dios Vivo Columna Y Apoyo De La Verdad La Luz Del Mundo, Inc. v. Downing*, 321 Ga. App. 778, 783 (1) (742 SE2d 742) (2013). But the Real Estate Appraiser Act and GAFLA are found in different titles of the Georgia Code, and they have different subject matters and purposes: the Real Estate Appraiser Act addresses the licensure, classification, and regulation of real estate appraisers and appraiser management companies, see OCGA § 43-39A-1 et seq., while GAFLA is a consumer protection law that addresses abusive home lending practices engaged in by creditors, see OCGA § 7-6A-1 et seq. Hence, the Real Estate Appraiser Act and GAFLA "are different in their purpose and effect . . . [such that] the provisions of the one [a]ct are not controlling in the interpretation of the other." *Liberty Loan Corp. of Shoals v. Childs*, 140 Ga. App. 473, 476 (1) (231 SE2d 352) (1976) (concluding that the Georgia Industrial Loan Act and the Georgia Retail Installment and Home

20

Solicitation Sales Act should not be construed together because they have different purposes and effects).

Furthermore, the definition of "regularly extends consumer credit" found in OCGA § 43-39A-2 (32) of the Real Estate Appraiser Act was not added to that statute until July 1, 2019. See Ga. L. 2019, p. 724, § 1. Notably, against that legal backdrop, the General Assembly did not similarly amend OCGA § 7-6A-2 of GAFLA in 2019, and when the legislature did amend the definitions found in OCGA § 7-6A-2 in 2020 and again in 2021 and 2022, it did so without adding a definition for "regularly extends consumer credit," much less incorporating the definition of that phrase found in OCGA § 43-39A-2 (32). See Ga. L. 2020, p. 320, § 24; Ga. L. 2021, p. 323, § 38; Ga. L. 2022, p. 220, § 47. Accordingly, "we discern the absence of such language was a matter of considered choice" by the legislature. (Citation and punctuation omitted.) *Moosa Co.*, 353 Ga. App. at 433 (presuming that General Assembly's failure "to amend the specified appellate procedure codified in OCGA § 48-11-18 so as to broaden the scope of appellate forums available to tobacco taxpayers" when the legislature passed general jurisdictional statutes creating a tax tribunal "was a matter of considered choice," and further noting that this conclusion was "buttressed by the fact that OCGA § 48-11-18 was last amended . . . after the General Assembly created

21

the [tax tribunal]"). See *Irvin v. Macon Telegraph Publishing Co.*, 253 Ga. 43, 44 (1) (b) (316 SE2d 449) (1984) (rejecting argument that amendment to Georgia's Sunshine Law, OCGA § 50-14-1 (b), to define "public records" was intended by the General Assembly also to apply to Georgia's Open Records Act, OCGA § 50-18-70, where the legislature could have amended the Open Records Act to incorporate that definition but failed to do so). See generally *City of Guyton v. Barrow*, 305 Ga. 799, 805 (3) (828 SE2d 366) (2019) ("The primary determinant of a text's meaning is its context, which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text."). The definition of "regularly extends consumer credit" in OCGA § 43-39A-2 (32) of the Real Estate Appraiser Act therefore is inapplicable to OCGA § 7-6A-2 (6) of GAFLA.

In moving for summary judgment, the Scissoms also relied on OCGA § 7-1-1001 (a) (16) and asserted that "Georgia law makes clear an intention to avoid ensnaring the natural person who makes five (5) or fewer mortgage loans in any calendar year." OCGA § 7-1-1001 (a) (16) provides in part:

> The following persons shall not be required to obtain a mortgage loan
> originator, mortgage broker, or mortgage lender license and shall not be

22

subject *to the provisions of this article* but may be subject to registration requirements, if registration of such persons is required by *this article*: . . . Any natural person who makes five or fewer mortgage loans in any one calendar year. . . .

(Emphasis supplied.)

The Scissoms's reliance on OCGA § 7-1-1001 (a) (16) to inform the meaning of "regularly extends consumer credit" in OCGA § 7-6A-2 (6) is misguided. OCGA § 7-1-1001 (a) (16) expressly applies only to the requirements of Article 13 of Chapter 1 of Title 7 of the Georgia Code and therefore by its plain language should not be used to determine the meaning of a phrase contained in a different article. Furthermore, Article 13 of Chapter 1 of Title 7 addresses the licensing and registration of mortgage lenders, mortgage brokers, and mortgage loan originators by the Department of Banking and Finance, but that Department has entirely separate and independent regulatory authority over persons and entities covered by GAFLA. In this regard, GAFLA contains an enabling statute that provides in part:

> Without limitations on the power conferred by Chapter 1 of this title, the Department of Banking and Finance shall have the authority to promulgate rules and regulations not inconsistent with law for the enforcement of [GAFLA] to effectuate the purposes of [GAFLA] and to clarify the meaning of terms. . . .

23

OCGA § 7-6A-13. Consequently, the limitations imposed on the licensing authority of the Department of Banking and Finance by OCGA § 7-1-1001 are inapposite and have no bearing on GAFLA. Additionally, as previously noted, when the General Assembly chose to incorporate other statutes or regulations into GAFLA, it knew how to do so, as evidenced by its references to federal statutes and regulations, and we thus must presume that its failure to incorporate the limitations imposed by OCGA § 7-1-1001 into GAFLA "was a matter of considered choice." *Transportation Ins. Co.*, 271 Ga. at 776. See *Bauerband*, 278 Ga. at 225-226 (3); *Avila*, 333 Ga. App. at 69-70.

In sum, we conclude that the trial court erred in the manner in which it construed the meaning of the phrase "regularly extends consumer credit" as used in the definition of "creditor" found in OCGA § 7-6A-2 (6) of GAFLA. By its plain meaning supplied by dictionaries, a person who "regularly extends consumer credit" is a person who extends credit to consumers on a frequent and recurring basis. Thus, to show that a defendant is a "creditor" under the first sentence of OCGA § 7-6A-2 (6), the plaintiff must point to evidence that the defendant on a frequent and recurring basis extended consumer credit that was (i) subject to a finance charge or (ii) payable

24

by written agreement in more than four installments.[8] The trial court erred in concluding that "consumer credit" was limited to home loans and in relying on 12 CFR § 1026.2 (a) (17) (v) contained in Regulation Z of TILA to narrow the meaning of "regularly extends consumer credit" found in OCGA § 7-6A-2 (6). We also reject the Scissoms's argument that OCGA § 43-39A-2 (32) of the Real Estate Appraiser Act and OCGA § 7-1-1001 (a) (16) control the meaning of "regularly extends consumer credit" contained in OCGA § 7-6A-2 (6).

Because the trial court misconstrued the phrase "regularly extends consumer credit," the court did not apply the proper legal analysis in determining whether each of the Scissoms was a "creditor" under OCGA § 7-6A-2 (6) of GAFLA, and the parties have not fully briefed the issue utilizing that analysis. Accordingly, we exercise our discretion to vacate the portion of the trial court's order addressing the "creditor" issue and remand for the court to apply the correct legal analysis in determining whether summary judgment is appropriate on Crowe's GAFLA claims. See *Wanna v. Navicent Health*, 357 Ga. App. 140, 158 (6) (850 SE2d 191) (2020) (vacating portion of trial court's summary judgment order and remanding for consideration under the proper legal analysis); *Glass v. Gates*, 311 Ga. App. 563,

---

[8] See supra footnotes 6 and 7.

25

573-574 (1) (716 SE2d 611) (2011) (concluding that because the trial court applied the wrong statutory definition of "motor vehicle" and the issues had not been fully brief by the parties on appeal, the trial court's grant of summary judgment should be vacated and the case remanded for the court to apply the proper definition in determining whether summary judgment was proper), aff'd, 291 Ga. 350 (729 SE2d 361) (2012) . See also *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (holding that under certain circumstances, "judicial economy may be maximized by returning the case to the trial court upon the appellate court's discovery that the trial court relied on an erroneous legal theory or reasoning," and that the decision whether to pursue such a course "must be left to the appellate court's discretion").

(b) *The Definition of "Home Loan."* Crowe argues that the trial court erred in finding that the uncontroverted evidence showed that the loan he received from the Scissoms did not meet the definition of a "home loan" under OCGA § 7-6A-2 (8) of GAFLA. We agree with Crowe.

In pertinent part, OCGA § 7-6A-2 (8) defines "home loan" as a loan secured by a "deed to secure debt on real estate located in this state upon which there is located . . . a structure . . . which is or will be occupied by a borrower as the

borrower's principal dwelling." Exempted from the definition of a "home loan" is "[a] loan primarily for business, agricultural, or commercial purposes." OCGA § 7-6A-2 (8) (F).

(i) In concluding that the definition of "home loan" was not met in this case, the trial court determined that the uncontroverted evidence showed that the house on the Property was not Crowe's domicile or primary residence and thus was not his "principal dwelling" under OCGA § 7-6A-2 (8). The trial court erred in this determination.

OCGA § 7-6A-2 (8) refers to the borrower's "principal dwelling" but does not define that term, and therefore we assume that the General Assembly intended for the ordinary meaning of those words to apply. See OCGA § 1-3-1 (b); *Couch*, 291 Ga. at 364 (1); *ADC Constr. Co.*, 191 Ga. App. at 33 (1). "Principal," when used as an adjective, is commonly understood to mean "[c]hief, primary; most important." *Principal*, Black's Law Dictionary (11th ed. 2019). See *Principal*, Oxford English Online Dictionary (last visited July 7, 2022), https://www.oed.com/view/ Entry/151442?redirectedFrom=principal#eid (defining "principal" to mean, in pertinent part: "Of a number of things or persons, or one of their number: belonging to the first rank; among the most important; prominent, leading, main"). And a

27

"dwelling-house" or "dwelling" ordinarily refers to "[t]he house or other structure in which one or more people live; a residence or abode." *Dwelling-house*, Black's Law Dictionary (11th ed. 2019). See *Dwelling*, Oxford English Online Dictionary (last visited July 7, 2022), https://www.oed.com/view/Entry/58767?rskey= 7iqYGq&result=2&isAdvanced=false#eid (defining "dwelling" to mean, in pertinent part: "A place of residence; a dwelling-place, habitation, house"). Hence, as reflected by the aforementioned dictionary definitions, the term "principal dwelling" is naturally and reasonably construed to mean a person's chief or primary residence. The proper inquiry under OCGA § 7-6A-2 (8), therefore, is whether the borrower is or is intending to occupy the house on the subject property as his chief or primary residence.

Here, Crowe asserted in his verified complaint, affidavit, and/or deposition testimony that he purchased the Property to serve as a residential family home, that his longterm plan was to retire there, and that he began living at the Property four days a week after the closing of the Property in 2014 and then moved there full time after he and his wife separated in 2015. Crowe also submitted the affidavits of several individuals who averred that they had first-hand knowledge that Crowe had lived at the Property. This combined evidence, construed in the light most favorable to

28

Crowe, created a genuine issue of material fact as to whether the house on the

Property was occupied by Crowe as his chief or primary residence and thus as his

"principal dwelling" under OCGA § 7-6A-2 (8). And while there was conflicting

evidence regarding where Crowe primarily resided after acquiring the Property, a

jury, not the courts, must resolve such conflicts. See *Smith v. Tenet Health System*

*Spalding*, 327 Ga. App. 878, 879 (1) (761 SE2d 409) (2014). See also *Baldwin v.*

*State Farm Fire & Cas. Co.*, 264 Ga. App. 229, 230 (1) (590 SE2d 206) (2003)

(noting that questions regarding a person's residence "are mixed questions of law and

fact and are ordinarily one for a jury to determine").

In granting summary judgment to the Scissoms, the trial court relied in part on

its finding that the Property was not Crowe's domicile.[9] Pretermitting whether there

was sufficient evidence from which a jury could find that the Property was Crowe's

domicile, we conclude that the trial court erred in relying on that jurisdictional

---

[9] "Residence usually includes an intent to live in the place for the time being. Domicile, unlike residence, means a permanent place of habitat." (Citation and punctuation omitted.) *Bryson v. State*, 282 Ga. App. 36, 40 (1) (c) (638 SE2d 181) (2006). "To acquire a domicile, there must be a concurrence of actual residence and the intention to remain. If a person actually removes to another place, with the intention of remaining there for an indefinite period of time as a place of fixed domicile, such place becomes his domicile." (Citations and punctuation omitted.) *Hardee v. Whitlock*, 345 Ga. App. 536, 537 (813 SE2d 616) (2018).

29

concept when evaluating the issue of Crowe's principal dwelling. If the legislature had intended for a borrower's domicile to constitute his or her principal dwelling under GAFLA, it would have used that word or defined "principal dwelling" as meaning domicile. See *ADC Constr. Co.*, 191 Ga. App. at 34 (1) (concluding that the terms "resident" and "nonresident" in the Nonresident Contractor Act should be given their plain and ordinary meanings, that residence should not be treated as synonymous with domicile under the Act, and that "[i]f the legislature wanted a contractor's domicile to determine his liability under the Act, it would have used that word or defined 'residence' as meaning 'domicile.'"). Cf. OCGA § 21-2-2 (32) (stating that "'[r]esidence' means domicile" for purposes of the Georgia Election Code). Consequently, the trial court erred by importing the jurisdictional concept of domicile into the analysis of a borrower's "principal dwelling" under OCGA § 7-6A-2 (8).

Additionally, in its summary judgment order, the trial court noted that Crowe's wife filed for divorce in Cobb County and that the final judgment and decree of divorce was entered in that county. The trial court treated the venue of the divorce case as reflecting that Crowe's principal dwelling was not at the Property in Union County. However, Crowe's wife did not file her divorce action against Crowe until November 2017, and the final judgment and decree of divorce was not entered until

30

August 2019. OCGA § 7-6A-2 (8) does not specify a length of time that a property must remain a borrower's "principal dwelling," and, as previously noted, Crowe presented evidence that the house on the Property was his chief or primary residence in 2014 and 2015, when he entered into the loan transaction with the Scissoms and for the time period immediately thereafter. Under these circumstances, Crowe presented sufficient evidence to create a genuine issue of material fact over whether the house on the Property was his "principal dwelling" and thus over whether the loan at issue was a "home loan" under OCGA § 7-6A-2 (8).

(ii) The trial court also concluded that the loan to Crowe was exempt from the definition of a "home loan" because the uncontroverted evidence showed that Crowe acquired the Property to subdivide it for income and profit and thus obtained the loan from the Scissoms primarily for business or commercial purposes. The trial court erred in so ruling. A loan is exempt from the definition of a "home loan" if the loan was "*primarily* for business, agricultural, or commercial purposes." (Emphasis omitted.) OCGA § 7-6A-2 (8) (F). And here, Crowe averred in his affidavit that he purchased the Property to serve as a residential family home and as the place of his future retirement, and that he never rented out the house on the Property or treated the house as investment property. As previously noted, Crowe also asserted that he lived

31

at the house on the Property four days a week after purchasing it in 2014 and fully moved there after he separated from his wife in 2015. During his deposition, Crowe testified that he did plan to subdivide the acreage so that he could use a portion of it to build another house where his parents could live or that he could rent for additional income, but that ultimately he did not pursue his plan after discovery of the easements on the Property. In contrast, the Scissoms presented the affidavit of another witness who averred that Crowe made only sporadic use of the Property and had expressed his desire and intention to develop the Property for investment purposes. This conflicting evidence created a genuine issue of material fact as to whether the loan obtained by Crowe from the Scissoms was primarily for business or commercial purposes that a jury must resolve, and the trial court erred in concluding otherwise. See *Smith*, 327 Ga. App. at 879 (1).

In sum, because there were genuine issues of material fact as to whether the house on the Property was Crowe's "principal dwelling" and as to whether the loan to him was "primarily for business . . . or commercial purposes," the trial court erred in granting summary judgment on the question of whether the loan at issue met the definition of a "home loan" under OCGA § 7-6A-2 (8) of GAFLA. Accordingly, we reverse that portion of the trial court's summary judgment order.

32

2. We next address Crowe's contention that the trial court erred in granting summary judgment in favor of the Scissoms on his claims for breach of warranty predicated on the easements he discovered on the Property after the closing. In seeking reversal, Crowe argues in his appellate brief that the trial court erred in finding that he was not harmed by the easements. However, the trial court also granted summary judgment on the alternative ground that Crowe lacked standing because he no longer had an interest in the Property as a result of the foreclosure and did not take any steps to cure the alleged defects in the title while he owned the Property. Crowe does not address this alternative ground in his appellate brief.

"Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment." (Citation and punctuation omitted.) *Hewitt v. Community & S. Bank*, 324 Ga. App. 713, 716 (2) (751 SE2d 513) (2013). Accordingly, in light of Crowe's failure to address the

alternative basis for the trial court's ruling in his appellate brief,[10] we affirm the court's grant of summary judgment on the breach-of-warranty claims. See id.

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Brown and Hodges, JJ., concur*.

---

[10] In his reply brief, Crowe argues for the first time that he had standing to pursue his warranty claims because the present action was a properly filed renewal action of his previous action, and at the time he filed his previous action, he still owned the Property. [W]e do not consider arguments that are raised for the first time in a reply brief." *Vann v. Finley*, 313 Ga. App. 153, 154, n. 2 (721 SE2d 156) (2011). Furthermore, Crowe did not raise his argument regarding his renewal action in response to the Scissoms's motion for summary judgment in the court below, and the trial court did not rule on that specific issue in addressing whether Crowe had standing. "It is well settled that appellate courts will not consider new arguments in opposition to a motion for summary judgment raised for the first time on appeal." (Citation and punctuation omitted.) *Simmons v. Universal Protection Svcs.*, 349 Ga. App. 374, 381 (3) (825 SE2d 858) (2019).