**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**August 6, 2015**

# In the Court of Appeals of Georgia

A15A1258. WEYER v. THE STATE.

BARNES, Presiding Judge.

A jury found Jamie Lee Weyer guilty of two counts of sexual exploitation of children, and the trial court denied his amended motion for new trial. On appeal, Weyer contends that the evidence was insufficient to support his convictions and that the trial court committed plain error by failing to define the word "entice" when requested to do so by the jury. For the reasons discussed below, we affirm.

1. We first address the sufficiency of the evidence.

When we consider whether the evidence is sufficient to sustain a conviction, we ask whether any rational jury could have found proof beyond a reasonable doubt of the guilt of the defendant in the evidence adduced at trial, viewing that evidence in the light most favorable to the verdict. And as we consider this question, we must keep in mind that it is for the jury, not appellate judges, to weigh the evidence, pass upon the credibility of witnesses, and resolve conflicts in the evidence. So, if the record contains some competent evidence sufficient to prove beyond a reasonable doubt each element of the crime of which the defendant was

convicted, we must uphold the conviction, even if the evidence is contradicted.

(Citations omitted.) *Copeny v. State*, 316 Ga. App. 347 (1) (729 SE2d 487) (2012).

Viewed in the light most favorable to the verdict, the evidence showed that on August 9, 2012, the teenage child A.M., who lived with her grandmother, was at home in her bedroom with her cousin, H.M., who was spending the night. A.M. and H.M. were both 16 years old. The grandmother's boyfriend, Weyer, also was at the house, but in a different room. Weyer, who was 49 years old, had known A.M. since she was five and H.M. since she was "little."

Around 10:20 p.m., Weyer began sending text messages to A.M. in which he requested nude photographs of her and H.M. Weyer continued sending text messages until shortly after midnight and then started again the next morning. A.M. and H. M. later testified that Weyer's text messages scared them. H.M. was afraid Weyer "was going to come in the room to us" after he made the request for photographs.

With respect to the text messages at issue, Weyer initially texted A.M., "I've been really good to yall latley right?"[1] When A.M. did not answer, Weyer wrote, "I

---

[1] We have preserved the original spelling, abbreviations, and punctuation of the text messages in our summary of the evidence adduced at trial.

want something but im afraid to ask-nuthin physical!" A.M. replied, "Tell me," and Weyer responded, "no-its not right-but i love thinkin about it" and emphasized that A.M. could not tell her grandmother.[2] After A.M. promised that she would not tell, Weyer texted, "i want sum pics of you and [H.M.]!" A.M. asked Weyer what kind of photographs he wanted, and Weyer replied, "Idk-i think you do, but i don't wqnt no problems!" When A.M. again asked what kind of photographs he wanted, Weyer wrote, "NAKED- i want to see your fine asses and tits naked" and promised that he would hide the photographs.

A.M. indicated to Weyer that she was afraid that her grandmother would see the photographs if she took them on her phone. Weyer wrote in response that he could provide A.M. with his phone. A.M. replied, "Not now. Have to get a shower. . . ." Weyer wrote back, "Okay," and then "Tell me what to do!" followed by "I can wait!! I've been watching this long. ok."

A.M. then sent Weyer a photograph of herself in a bikini. Weyer responded, "PLEASE! more baby!:-)" and "i want more please!" A.M. wrote back that she was busy, to which Weyer replied, "Ok-sorry not tryin to push. we will have ops for more-

---

[2] Weyer and A.M. refer to A.M.'s grandmother as "Mom" or "Momma" in the text messages.

3

ihope thats what you want to." A.M. wrote, "K," and Weyer responded, "Thank you!:-)."

A few minutes later, Weyer texted A.M. to ask if she was "freaking out" and if she could "send sum from [H.M.'s] phone." When A.M. did not respond, Weyer wrote, "Please tell me sumthin" and then, "Please!" A.M. replied, "I'm not freakin out. I'm sleepin." Weyer texted back, "ok-your not afraid of me are ya?," and A.M. replied, "No." Weyer then wrote that he loved the photograph A.M. had sent him and asked her if she could "send more from [H.M.'s] phone." After receiving no response, Appellant texted A.M., "Your [grandmother] is asleep-im in the bathroom-you could come get my phone," and then wrote, "C'mon look what i do for you :-)." With no response from A.M., Weyer concluded by texting, "Okay but promise you will in the future!" A.M. did not respond to Weyer's final text that night.

The next morning, Weyer was sitting on the front porch when A.M. and H.M. were leaving the house to drive to school. When Weyer saw A.M. and H.M., he said, "Have a good day, girls," and winked at them. After A.M. and H.M. got in the car, they noticed that a pack of cigarettes and Weyer's lighter had been placed in the middle console area.

4

As A.M. and H.M. drove to school, Weyer sent several text messages to them referring to his prior request for photographs and asking if they were upset with him. When Weyer texted H.M. to ask whether she would send him any photographs, H.M. replied, "Hell no." Weyer then wrote, "aww to bad for me but are we cool?," and HM responded, "Ya." Weyer texted back, "good! Hate to think we wasnt-hope you change your mind-i can hide em :-)." H.M. replied, "Jamie im 16?," and thereafter noted that A.M. was the same age. Weyer ended the exchange by texting, "Cant blame a guy for tryin! hope we still cool bot everything else. :-)," and "good wouldnt want iit any other way!:)"

After A.M. and H.M. arrived at school, they spoke to the high school resource officer about the text messages sent by Weyer. The resource officer contacted a police investigator, who interviewed A.M. and H.M. and took possession of their phones. A forensic analysis subsequently was conducted of the phones, resulting in the successful retrieval of the relevant text messages and the photograph that A.M. had sent to Weyer.

The police investigator procured an arrest warrant and arrested Weyer later that same day. Weyer spoke with an investigator after he was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). Weyer told

5

the investigator that he had been drinking alcohol that night, admitted that he exchanged text messages with A.M. and H.M., and provided a cell phone number for himself that matched the number from which the relevant text messages had originated. However, Weyer claimed that he could not remember the content of the messages that he had sent and denied that he ever provided A.M. or H.M. with cigarettes.

The police investigator obtained Weyer's phone, and a forensic analysis was performed of its contents. While none of the relevant text messages between Weyer and A.M. or H.M. could be found on Weyer's phone, Weyer admitted that he had deleted some of his messages. But Weyer had not deleted from his phone the photograph of A.M. in a bikini that she had sent him.

Weyer was indicted on two counts of sexual exploitation of children for enticing A.M. and H.M. to take nude photographs of themselves. A jury trial ensued at which A.M. and H.M. testified to events as summarized above. In addition to their testimony regarding the incident in question, A.M. and H.M. testified about previous interactions they had with Weyer. A.M. testified that earlier that summer, Weyer had slapped her on the buttocks with his hand, commenting that her shorts were too short. H.M. testified that on a prior occasion, she was sitting alone with Weyer on the back

6

porch, and he began speaking to her with his face close to her face. When H.M. tried to move away, Weyer had replied, "No, baby, come here." Both A.M. and H.M. further testified that on previous occasions that summer, Weyer had provided them with cigarettes and allowed them to smoke in his presence.

The State also called the police investigator involved in the case and introduced expert testimony regarding the forensic analysis of the phones, as well as printouts of the relevant text messages and the photograph of A.M. in a bikini that she had sent to Weyer. Additionally, the State introduced and played for the jury a video recording of Weyer's interview with the police investigator. Weyer elected not to testify and did not call any defense witnesses.

After the close of the evidence and the charge of the court, the jury found Weyer guilty of both charged offenses. Weyer filed a motion for new trial, as amended, and the trial court denied the motion. This appeal followed.

Under Georgia's sexual-exploitation-of-children statute, "[i]t is unlawful for any person knowingly to . . . entice . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual medium depicting such conduct." OCGA § 16-12-100 (b) (1). "Sexually explicit conduct" is defined to include the "[l]ewd exhibition of the genitals or pubic area of any person." OCGA §

7

16-12-100 (a) (4) (D). "Visual medium" is defined as "any film, photograph, negative, slide, magazine, or other visual medium," OCGA § 16-12-100 (a) (5), and "minor" is defined as any person under 18 years old. OCGA § 16-12-100 (a) (1).

Count 1 of the indictment alleged in relevant part that Weyer committed sexual exploitation of children by enticing A.M. "to engage in sexually explicit conduct, to wit: take off her clothing and take a photography of herself naked, for the purpose of producing a digital photograph, a visual medium depicting such conduct." Count 2 of the indictment alleged that Weyer committed sexual exploitation of children by enticing H.M. in the same manner.

(a) Weyer contends that there was insufficient evidence to support his convictions because the State failed to prove that any photographs showing the lewd exhibition of the genitals or pubic area of A.M. or H.M. were ever taken and transmitted to him. Weyer emphasizes that the only photograph introduced into evidence showed A.M. in a bikini and argues that, as a result, his convictions must be overturned in light of our decision in *Craft v. State*, 252 Ga. App. 834, 839-843 (1) (558 SE2d 18) (2001), where we held that certain photographs at issue were not lewd as a matter of law because the children in them were shown engaging in

nonsexual, innocent activities. See *Scarborough v. State*, 317 Ga. App. 523, 525 (1) (731 SE2d 396) (2012) (discussing holding in *Craft*).

Weyer's contention is misplaced. The statutory language of OCGA § 16-12-100 (b) (1) proscribes, among other things, the *enticement* of a minor "for the purpose of producing" a visual medium depicting sexually explicit conduct engaged in by the minor. By its plain language, a conviction under OCGA § 16-12-100 (b) (1) does not require a showing by the State that the photograph or other visual medium was ever produced; rather, it is sufficient for the State to prove that the production of the photograph or other visual medium depicting sexually explicit conduct engaged in by the minor was the *intended motivation* for the enticement. Cf. *Bolton v. State*, 310 Ga. App. 801, 804-805 (1) (714 SE2d 377) (2011) (conviction for on-line solicitation of a minor under OCGA § 16-12-100.2 (d) (1) did not require proof that the underlying purpose of the solicitation – child molestation – was ever accomplished because "the principal act proscribed by the crime is solicitation") (emphasis omitted); *Lasseter v. State*, 197 Ga. App. 498, 499-500 (1) (399 SE2d 85) (1990) (conviction for enticement of a child for indecent purposes under OCGA § 16-6-5 (a) "need not be based upon evidence that an act of indecency or child molestation was accomplished or even attempted," but instead is "based upon some evidence that an act of indecency

9

or child molestation was the intended motivation for the enticement") (emphasis omitted). Thus, the State was not required to prove that a photograph of A.M. and H.M. engaging in sexually explicit conduct was ever taken or transmitted to Weyer to obtain his conviction for enticement under OCGA § 16-12-100 (b) (1).

Furthermore, *Craft*, 252 Ga. App. 834, is clearly distinguishable. The defendant in *Craft* was charged with the sexual exploitation of children under other subsections of OCGA § 16-12-100 (b) that forbid the creation, possession, or transport into the State of photographs or other visual mediums depicting minors engaged in sexually explicit conduct. See OCGA § 16-12-100 (b) (5), (7), (8). See *Craft*, 252 Ga. App. at 834, n.1. Thus, *Craft* does not control in cases like the present one where a defendant is charged with the sexual exploitation of children based on enticement under OCGA § 16-12-100 (b) (1).

(b) Weyer further contends that even if the State was not required to prove the production of photographs of A.M. and H.M. engaged in sexually explicit conduct, his convictions still must be reversed because there was insufficient evidence that his intent was to obtain photographs from A.M. and H.M. engaged in such conduct. Weyer notes that "sexually explicit conduct" is defined by statute to include only the lewd exhibition of the "genitals or pubic area" of the minor, OCGA § 16-12-100 (a)

10

(4) (D), and he argues that the text messages introduced at trial reflect that he sought photographs of A.M. and H.M.'s breasts and buttocks, not their genitals or pubic areas.

As an initial matter, we agree with Weyer that "genitals" and "pubic area" do not include buttocks or breasts. "Genitals" and "pubic area" are not defined in OCGA § 16-12-100, but the word "genitals" is commonly understood to mean "[t]he reproductive organs, especially the external reproductive organs and associated structures." American Heritage Dictionary of the English Language (5th ed. 2011). "Pubic" is commonly understood to mean "[o]f, relating to, or located in the region of the pubis or the pubes," and "pubes" means "[t]he lower part of the abdomen, especially the region surrounding the external genitals." Id. Furthermore, OCGA § 16-12-100 differentiates between "genitals," "pubic area," "buttocks," and a "female's nude breasts." See OCGA § 16-12-100 (a) (4) (G). "All the words of a statute are to be given due weight and meaning," and "[c]ourts should not so interpret a statute as to make parts of it surplusage unless no other construction is reasonably possible." *Undercofler v. Colonial Pipeline Co.*, 114 Ga. App. 739, 742-743 (152 SE2d 768) (1966). Where the legislature uses different terms in the same statute, we generally assume that different meanings were intended for those terms. *Lawrence v.*

11

*State*, 305 Ga. App. 199, 202 (3) (699 SE2d 406) (2010). Consequently, the terms "genitals" and "pubic area" in OCGA § 16-12-100 (a) (4) (D) do not include buttocks or breasts, as the State itself acknowledges on appeal.

Nevertheless, Weyer's argument regarding the sufficiency of the evidence is without merit. Weyer clearly sought nude photographs of A.M. and H.M. when he wrote to A.M., "NAKED-i want to see your fine asses and tits naked!!" Based upon a narrow interpretation of part of this specific text message, Weyer argues that he wanted photographs of the victims' breasts and buttocks and nothing more, but the jury was not required to leave its common sense at the door in resolving this case. Rather, the jurors were entitled to draw reasonable inferences from the evidence based on their own common-sense understanding of the world. See *Lanier v. State*, 237 Ga. App. 875, 877 (4) (517 SE2d 106) (1999) ("Jurors are entitled to use their own common sense as intelligent human beings on many questions.") (citation and punctuation omitted). And in reviewing the sufficiency of the evidence on appeal, we look to the evidence as a whole, not a single piece of evidence in a vacuum. See *Johnson v. State*, 269 Ga. 632, 635 (501 SE2d 815) (1998) (evaluating sufficiency of the evidence by "[c]onsidering the evidence as a whole"). Based upon all of the text messages and other evidence adduced at trial, a rational jury could find that Weyer

12

was seeking nude photographs that would show all the intimate areas of the victims' bodies, including their genitals and pubic areas. In other words, a rational jury could find that Weyer was seeking the most explicit photographs he could obtain from A.M. and H.M. rather than photographs limited to specific body parts. Accordingly, there was evidence to support a finding that Weyer's intended motivation was to obtain photographs of A.M. and H.M. engaged in "sexually explicit conduct" as that phrase is defined by the statute.

(c) Lastly, Weyer contends that there is no evidence that he "enticed" A.M. and H.M. through the text messages that he sent to them. In this regard, Weyer argues that he "merely stated he would like the girls to send him some pictures" and "never offered them anything in return."

"Entice" is not expressly defined in OCGA § 16-12-100, but its common and ordinary meaning is "to draw on, by exciting hope and desire; to allure; to attract." *Coker v. State*, 164 Ga. App. 493, 495 (1) (297 SE2d 68) (1982) (quoting *Arrington v. State*, 3 Ga. App. 30, 34 (59 SE 207) (1907)). See also *Skelhorn v. State*, __ Ga. App. __ (3) (b) (Case No. A15A0280, decided June 16, 2015). "Entice" also is commonly understood to mean "to solicit" or "to tempt." See *State v. Wilson*, 318 Ga.

13

App. 88, 96 (1) (c) (ii) (732 SE2d 330) (2012); *Spivey v. Sellers*, 185 Ga. App. 241, 242 (363 SE2d 856) (1987).

Here, Weyer solicited nude photographs of A.M. and H.M. in his text messages to them, and he began the text messages by asking, "I've been really good to yall latley right?" Moreover, there was circumstantial evidence that the morning after his initial request for the nude photographs, Weyer provided cigarettes along with a lighter to A.M. and H.M. to tempt and attract them into granting his request. Consequently, there was sufficient evidence for the jury to find that Weyer enticed A.M. and H.M.

2. Weyer also contends that the trial court erred by failing to specifically define the term "entice" when requested to do so by the jury and instead instructing the jury that it should assign such words their "ordinary meaning." As a result of this alleged error, Weyer contends that he is entitled to a new trial. We are unpersuaded.

The record reflects that in its initial charge to the jury, the trial court instructed the jury without objection:

A person commits sexual exploitation of children when he knowingly entices any minor to engage in or assist any other person to engage in any sexually explicit conduct for the purpose of producing any visual medium depicting such conduct. Sexually explicit conduct is defined as

14

actual or simulated lewd exhibition of the genitals or pubic area of any person. Visual medium is defined as any photograph or other visual medium. Minor means any person under the age of 18 years of age.

Subsequently, during its deliberations, the jury sent out a note requesting that the trial court "[d]efine entice." Before responding to the jury's request, the trial court consulted with the State and Weyer's trial counsel outside the presence of the jury. The trial court suggested that it instruct the jury that "[w]ords will having their ordinary meaning," and Weyer's counsel responded, "It sounds good to me." The jury then entered the courtroom, and the trial court gave the following supplemental instruction:

> Your question is: "Define entice." In the jury instructions, I defined certain words and certain terms, and when I did you're required to follow that definition of those words or terms that you find in the jury instructions; otherwise, words that aren't specifically defined, you use their ordinary meaning. With that instruction, you can go back to the jury room, and continue deliberating.

As the jury was leaving the courtroom to resume deliberating, one juror asked, "Can we get a dictionary?" The trial court declined to provide a dictionary to the jury and reiterated, "The meaning of words come from the ordinary meaning that you use of words from your life experience and the learning that you've had in life." Weyer's

15

trial counsel did not object to any part of the trial court's supplemental instruction to the jury.

When a jury does not ask the trial court to recharge its instructions, "but rather to expound on them[,] . . . it [is] within the trial court's sound discretion to determine the need, breadth, and formation of any additional jury instructions." *Holloman v. State*, 291 Ga. 338, 344 (7) (729 SE2d 344) (2012). Furthermore, because Weyer did not object to the trial court's supplemental instructions, we review the instructions only for plain error. See OCGA § 17-8-58 (b); *Booker v. State*, 322 Ga. App. 257, 260 (2) (744 SE2d 429) (2013).

> [There are] four prongs to consider when analyzing a jury charge for plain error: First, there must be an error or defect – some sort of a deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

16

(Citation, punctuation, and emphasis omitted.) *Wilson v. State*, 291 Ga. 458, 459 (729 SE2d 364) (2012). See *Woodard v. State*, 296 Ga. 803, 806 (2) (771 SE2d 362) (2015); *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

The trial court committed no error by declining to specifically define the word "entice" for the jury as part of its supplemental instructions.[3]

> The rule is that when the charge embraces a section of the Code which contains technical words or expressions, the meaning of which is probably not understood by a person unlearned in the law, the court should so define them as to convey to the jury a correct idea of their meaning, but it is unnecessary for the court, even upon request, to explain words and expressions which are of ordinary understanding and self-explanatory.

(Footnote omitted.) *Millsaps v. State*, 310 Ga. App. 769, 772 (2) (714 SE2d 661) (2011). "Entice" as used in the statute defining sexual exploitation of children is a word of ordinary understanding,[4] and, therefore, the trial court was authorized to

---

[3] Given our conclusion that no error in the jury instruction has been shown, we need not reach the issue whether trial counsel's response, "It sounds good to me," constituted an affirmative waiver of Weyer's right to assert a claim of plain error on appeal. See *Kelly*, 290 Ga. at 34 (2), n.5 (declining to address whether defendant affirmatively waived plain error review).

[4] See, e.g., *Mitchell v. State*, 283 Ga. 341, 344 (3) (659 SE2d 356) (2008) ("homicide" was a word of ordinary understanding); *Philpot v. State*, 268 Ga. 168,

instruct the jury simply to apply the ordinary definition of that term. See *Garvey v. State*, 176 Ga. App. 268, 274 (5) (335 SE2d 640) (1985) ("Contrary to appellant counsel's assertion, the trial court did charge the jury on the definition of possession. He asked that the jury apply the ordinary definition of that word. Terms of common usage and meaning need not be specifically defined in the charge to a jury."). See also *Holloman*, 291 Ga. at 344 (7) (holding that the trial court did not err in declining to give dictionary definition of "felony" when requested to do so by the jury because "it was within the trial court's sound discretion to determine the need, breadth, and formation of any additional jury instructions").

Furthermore, the trial court acted within its discretion in declining the juror's request for access to a dictionary during deliberations. See *Long v. State*, 189 Ga. App. 131, 132 (2) (375 SE2d 274) (1988) (where jury requested dictionary or definition of certain terms, trial court acted within its discretion in fashioning supplemental instruction to the jury). Indeed, if a dictionary had been provided, jurors could have then looked up all manner of terms involved in the case, potentially

171 (3) (486 SE2d 158) (1997) ("knowingly" and "great risk" were words of ordinary understanding); *Millsaps*, 310 Ga. App. at 772 (2) ("incitement" was a word of ordinary understanding); *Baird v. State*, 201 Ga. App. 378 (411 SE2d 332) (1991) ("dangerous weapon" was a phrase of ordinary understanding).

causing prejudice to Weyer. See, e.g., *Chambers v. State*, 321 Ga. App. 512, 515-522 (1) (739 SE2d 513) (2013) (physical precedent only) (holding that defendant was entitled to new trial, where juror looked up legal definitions on Google and shared the definitions with other jurors); *Moore v. State*, 172 Ga. App. 844, 846-847 (324 SE2d 760) (1984) (holding that defendant was entitled to new trial, where juror studied book on the law and told jurors what he had learned).

For these combined reasons, we conclude that Weyer has failed to prove that the trial court committed any error in its fashioning of a supplemental instruction to the jury regarding the definition of "entice," and thus the first prong of the test for plain error has not been satisfied. See *Wilson v. State*, 291 Ga. at 459. The trial court therefore properly denied Weyer's motion for a new trial on the asserted ground.

*Judgment affirmed. Ray and McMillian, JJ., concur.*