**SECOND DIVISION**
**DOYLE, P. J.,**
**DAVIS, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**May 12, 2026**

# In the Court of Appeals of Georgia

A26A0394. RAMOS-GARCIA v. THE STATE.

DAVIS, Judge.

A Cherokee County jury found Diego Ramos-Garcia guilty of false imprisonment, aggravated stalking, and battery, family violence. Ramos-Garcia appeals from the trial court's order denying his motion for new trial, arguing that (1) the evidence was insufficient to sustain his convictions; and (2) the trial court erred by refusing his request for a jury instruction for the aggravated stalking offense. For the reasons that follow, we conclude that the evidence was sufficient to sustain Ramos-Garcia's convictions. We conclude, however, that the trial court erred by denying Ramos-Garcia's request for a jury instruction for the aggravated stalking offense and that the error was harmful. We therefore affirm Ramos-Garcia's

convictions for false imprisonment and battery, family violence, but we reverse his conviction for aggravated stalking, and we remand the case for a new trial on that charge.

Viewed in the light most favorable to the verdicts,[1] the evidence presented at trial shows the following. Ramos-Garcia previously lived with Maria Mendez Juarez and her four children on Academy Street in Canton, Georgia. Juarez and Ramos-Garcia met through a Facebook page, and he subsequently rented a room in her house.[2] According to Juarez, she and Ramos-Garcia were "like family," but she was not romantically involved with him. In April 2021, Juarez and Ramos-Garcia got into an altercation, which resulted in Juarez sustaining a bruise to her arm.[3] Following that incident, Ramos-Garcia was arrested, and as part of the special conditions of his bond, he was prohibited from approaching or communicating with Juarez, and he was

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[2] Juarez testified that Ramos-Garcia was not living with her at the time of trial.

[3] Juarez denied that Ramos-Garcia hit her, and she testified that the bruise was caused by her hitting a door or a bed.

ordered to stay away from her and her home on Academy Street. Ramos-Garcia signed a form acknowledging the special conditions of his pre-trial release.[4]

In the evening hours of February 12, 2022, Juarez's cousin called 911, and Juarez exclaimed to the 911 operator, "he's hitting me, he's hitting me," and the 911 translator noted that he heard a male voice in the background and that it sounded like a scuffle had ensued.[5] Juarez gave the operator her home address on Academy Street, and she said, "he's following me." Officer Michael Caplan of the Canton Police Department responded to Juarez's home, but she was not there. Dispatch traced the location of Juarez's call, and Officer Caplan ultimately found Juarez outside of a bar that was located near her home. Officer Caplan said that Juarez appeared "distressed," and he noted that a man, whom he later identified as Ramos-Garcia, was standing near Juarez and that the man attempted to leave as he approached. Rodney Starks, a security guard for the establishment, "aggressively" pointed at Ramos-Garcia, and Officer Caplan detained him. Starks said that he saw Juarez on the ground in the parking lot and that Ramos-Garcia held her by her hair and dragged her and hit

---

[4] The special conditions of bond form was entered into evidence.

[5] The 911 call was entered into evidence and played for the jury.

3

her while she screamed for help, and it appeared that Ramos-Garcia was trying to get Juarez into his vehicle against her will.

Officer Caplan then spoke with Juarez and asked her who Ramos-Garcia was, and she said that he was her "novio," which Officer Caplan interpreted as "boyfriend," and she stated that Ramos-Garcia "mistreats" her. Juarez also told Officer Caplan that Ramos-Garcia lived with her on Academy Street, and while speaking with Juarez, Officer Caplan observed "a large knot on the back of her head." At trial, Juarez testified that Ramos-Garcia only grabbed her hand and that she accidentally fell and hit her head. She also denied that Ramos-Garcia hit or punched her.

Ramos-Garcia was indicted on criminal attempt to commit kidnapping with bodily injury (OCGA § 16-4-1), false imprisonment (OCGA § 16-5-41), aggravated stalking (OCGA § 16-5-91), and battery, family violence (OCGA § 16-5-23.1(a) and (f)). Before trial, Ramos-Garcia submitted a written request to charge the jury on the definition of "harassing and intimidating" for the aggravated stalking charge, but the trial court denied his request. After the trial, the jury found Ramos-Garcia guilty of false imprisonment, aggravated stalking, and battery, family violence, but it acquitted

him of criminal attempt to commit kidnapping with bodily injury. The trial court imposed a 10-year sentence, with the first 3 years to be served in confinement and the balance to be served on probation.[6] Ramos-Garcia filed a motion for new trial, which the trial court denied after a hearing. This appeal followed.

1. First, in related enumerations of error, Ramos-Garcia argues that the evidence was insufficient to sustain his convictions. Specifically, he argues that (1) there was no evidence that he detained or confined Juarez to sustain his false imprisonment conviction; (2) he only committed a single violation of the protective order, which was insufficient to show a pattern of harassing and intimidating behavior to sustain his aggravated stalking conviction; and (3) there was no evidence that he was a "household member" to sustain his conviction for battery, family violence. We disagree and conclude that the evidence was sufficient to sustain his convictions.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence; moreover, this Court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. Resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not

---

[6] The trial court also imposed a $1,000 fine.

this Court. As long as there is some evidence, even though contradicted, to support each necessary element of the state's case, this Court will uphold the jury's verdict.

*Johnson v. State*, 367 Ga. App. 344 (886 SE2d 5) (2023). We note that

> [t]his is true even in cases in which the victim recants her previous accusation against the defendant. The reason for this rule is that a victim's prior inconsistent statements are admissible as substantive evidence for the jury's consideration. Thus, a jury is authorized to believe the victim's pre-trial statements rather than her in-court disavowal.

*McCurdy v. State*, 359 Ga. App. 885, 888(1)(d) (860 SE2d 172) (2021). With these principles in mind, we turn to the convictions at issue in this appeal.

### (a) False Imprisonment

OCGA § 16-5-41(a) provides: "A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority." The word "confine" for purposes of false imprisonment means "holding one within a location or keeping one within certain limits." *Moore v. State*, 340 Ga. App. 151, 154(2) n.2 (796 SE2d 754) (2017). Additionally, "a detention need not consist of physical restraint, but may arise

out of words, acts, gestures, or the like, which induce a reasonable apprehension that force will be used." *Kiser v. State*, 327 Ga. App. 17, 20(2) (755 SE2d 505) (2014). It is well settled that the false imprisonment statute

> on its face does not require that the imprisonment be for a specific length of time; all that is required is there be an arrest, confinement or detention of the person, without legal authority, which violated the person's liberty (i.e., against his or her will). At the point when that occurs, the offense is complete notwithstanding that the victim may thereafter effect an escape.

Id. at 19(2). And "[i]t is for the jury to decide if the detention amounted to false imprisonment." *Moore*, 340 Ga. App. at 154(2).

At trial, Juarez testified that Ramos-Garcia came to the establishment and grabbed her by the hand to get her to leave. Moreover, Starks testified that he observed Ramos-Garcia drag and pull Juarez by her hair while she was on the ground and that it appeared that Ramos-Garcia was trying to pull Juarez toward his vehicle against her will because she yelled for help and for someone to call the police. Thus, contrary to Ramos-Garcia's claims, the State presented evidence to show that Juarez was confined or detained within the meaning of the false imprisonment statute, and we therefore reject his claim that the evidence was insufficient to sustain his false

7

imprisonment conviction. See *Pierce v. State*, 301 Ga. App. 167, 169(1)(c) (687 SE2d 185) (2009) (holding that the evidence was sufficient to sustain the defendant's conviction for false imprisonment where the defendant grabbed the victim by her hair and dragged her from room to room); *Rehberger v. State*, 235 Ga. App. 827, 827–28 (1) (510 SE2d 594) (1998) (evidence was sufficient to sustain the defendant's conviction for false imprisonment where the defendant briefly held the victim against her will).

### (b) Aggravated Stalking

OCGA § 16-5-91(a) states that

> [a] person commits the offense of aggravated stalking when such person, in violation of a bond to keep the peace posted pursuant to Code Section 17-6-110, temporary restraining order, temporary protective order, permanent restraining order, permanent protective order, preliminary injunction, good behavior bond, or permanent injunction or condition of pretrial release, condition of probation, or condition of parole in effect prohibiting the behavior described in this subsection, follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

OCGA § 16-5-90(a)(1) defines "contact" as

> any communication including without being limited to communication in person, by telephone, by mail, by broadcast, by computer, by computer

8

network, or by any other electronic device; and the place or places that contact by telephone, mail, broadcast, computer, computer network, or any other electronic device is deemed to occur shall be the place or places where such communication is received.

Additionally, "harassing and intimidating" is defined as

a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

OCGA § 16-5-90(a)(1). We have been clear that "[a] defendant need not engage in unequivocally hostile conduct or make explicit threats in order to be convicted of stalking or aggravated stalking." *Slaughter v. State*, 327 Ga. App. 593, 596(1)(a) (760 SE2d 609) (2014) (quotation marks omitted). And critically, "*even a single violation of a protective order may violate OCGA § 16-5-91(a) if that violation is part of a pattern of harassing and intimidating behavior.*" Id. (emphasis supplied). "In considering whether evidence shows such a pattern, the jury can consider a number of factors, including the prior history between the parties, the defendant's surreptitious conduct, as well

9

as his overtly confrontational acts and any attempts by the defendant to contact, communicate with, or control the victim indirectly." Id. (quotation marks omitted).

Here, the evidence showed that after a criminal offense in April 2021 that involved Juarez and caused bruising to her arm, Ramos-Garcia was ordered by a magistrate court judge not to "approach or communicate" with Juarez, and he was also ordered to stay away from her home on Academy Street in Canton, Georgia. Ramos-Garcia signed the special bond conditions form on April 21, 2021, acknowledging that he was not to approach or communicate with Juarez and that he was not allowed at her home on Academy Street. Despite the court's order, in February 2022, Juarez told a 911 operator that a man was hitting her and that he was following her. Juarez then walked a short distance from her home to a local establishment, Starks said that he saw Juarez on the ground and that Ramos-Garcia dragged her by her hair and hit her as she screamed for help, and that it appeared that Ramos-Garcia was attempting to get Juarez into his vehicle against her will. Thus, the evidence showed that (1) Ramos-Garcia committed a prior act of violence against Juarez which led to the April 2021 court order prohibiting him from contacting Juarez or living with her; (2) he continued to live with Juarez in violation of the court's order;

and (3) despite the order, he hit Juarez and followed her to a local establishment where he again hit her and dragged her in the parking lot of the establishment. We conclude that this evidence was sufficient to show a pattern of harassing and intimidating behavior to sustain Ramos-Garcia's conviction for aggravated stalking. Compare *State v. Burke*, 287 Ga. 377, 377–79 (695 SE2d 649) (2010) (affirming the reversal of the defendant's aggravated stalking conviction based on single violation of a protective order where the evidence only showed that after the entry of a protective order, the defendant sent the victim an envelope which contained a card, a letter, and a handwritten poem).

### *(c) Battery, Family Violence*

Under OCGA § 16-5-23.1(a), "[a] person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another." "Visible bodily harm" means "bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts, or substantial bruises to body parts." OCGA § 16-5-23.1(b). Additionally, "[i]f the offense of battery is committed between household members, it shall constitute the offense of family

11

violence battery[.]" OCGA § 16-5-23.1(f)(2). "[T]he term 'household member' means past or present spouses, persons who are parents of the same child, parents and children, stepparents and stepchildren, foster parents and foster children, or other persons living or formerly living in the same household." OCGA § 16-5-23.1(f)(1). Importantly, in construing OCGA § 16-5-23.1(f), we have said that "[i]t is evident from the language employed that the legislature intended the statute to encompass some specie of familial–type relationship." *Gillespie v. State*, 280 Ga. App. 243, 245 (633 SE2d 632) (2006). "The statute, by its express language, applies to certain familial relations *and to persons who live together or formerly lived together*." Id. at 246 (emphasis supplied).

Here, Juarez testified that Ramos-Garcia rented a room in her house in April 2021 and that they were "like family." Additionally, Officer Caplan testified that Juarez told him that Ramos-Garcia was her "novio," which means "boyfriend," and that they lived together at her home on Academy Street. In light of the evidence that Juarez and Ramos-Garcia were living or formerly living in the same household and that Juarez said that Ramos-Garcia was "like family" and referred to him as her boyfriend, we conclude that this evidence was sufficient for a rational jury to find that

Ramos-Garcia was a "household member" under OCGA § 16-5-23.1(f)(1) to sustain his conviction for battery, family violence. See *Ward v. State*, 372 Ga. App. 383, 384, 387–88(2) (902 SE2d 211) (2024) (evidence was sufficient to find that the defendant was a household member under OCGA § 16-5-23.1(f)(1) where the victim stated that she was in a romantic relationship with the defendant and that he had "stayed mostly at [her] house."). And although Juarez's trial testimony may have conflicted at times, as stated above, "such conflicts and contradictions are matters of credibility for the jury to resolve; so long as some competent evidence supports the facts necessary for the State's case, the jury's verdict stands." Id. at 388(2).

Consequently, for all of the reasons stated above, Ramos-Garcia's insufficient evidence claims fail.

2. Second, Ramos-Garcia argues that the trial court erred by denying his request to charge the jury on the definition of "harassing and intimidating" for the aggravated stalking offense. We agree that the trial court erred by denying Ramos-Garcia's request for the instruction. And because we further conclude that the error was harmful, a new trial is required for the aggravated stalking charge.

"We review a trial court's refusal to give a requested jury instruction for abuse of discretion." *Brown v. State*, 369 Ga. App. 112, 114(1) (892 SE2d 409) (2023).[7] And "[i]n evaluating a claim that the trial court was required to give certain jury instructions, we view the charge as a whole to determine whether the jury was fully and fairly instructed." *Clark v. State*, 315 Ga. 423, 440(4) (883 SE2d 317) (2023) (citation modified).

It is well settled that "[a] requested charge must be legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence." *Salazar-Balderas v. State*, 343 Ga. App. 201, 203(1) (806 SE2d 644) (2017). And critically, the Supreme Court of Georgia has been clear that "[t]he failure to inform the jury of an essential element of the crime charged is reversible error because the jury is left without appropriate guidelines for reaching its verdict." *Burley v. State*, 316 Ga. 796, 805 (888 SE2d 507) (2023).

---

[7] Ramos-Garcia preserved this claim for appellate review because he submitted a written request to charge the jury on the definition of "harassing and intimidating," and he objected to the instructions after the trial court instructed the jury. See *Beck v. State*, 310 Ga. 491, 496(2) (852 SE2d 535) (2020) (defendant's claim that the trial court erred by denying his request for a jury instruction was preserved for appellate review because the defendant submitted a written request for the charge and objected to the trial court's failure to include that charge in its instructions to the jury).

14

Here, Ramos-Garcia submitted a written request to charge the jury on "harassing and intimidating" as follows:

> 'Harassing and intimidating' means (1) a knowing and willful course of conduct (i.e., pattern of behavior)[;] (2) which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family[;] (3) by establishing a pattern of harassing and intimidating behavior[;] and (4) which serves no legitimate purpose.

The trial court denied his request and instead instructed the jury as follows:

> Intent is an essential element of any crime and it must be proven by the State beyond a reasonable doubt. Intent may be shown in many ways provided you believe that it exists from the facts that have been proven to you and can be inferred from proven circumstances or by specific acts or conduct or intent which may in your discretion be inferred it was a natural and necessary consequence of a particular act. Whether or not you draw any such inference is a matter solely within your discretion.
>
> The defendant will not be presumed to have acted with criminal intent but you may find such an intent or the absence of it under consideration of words, conduct, demeanor, motive, and other circumstances connected with the act for which the accused is being prosecuted. In that regard, no person shall be convicted or guilty -- or found guilty of any crime committed by accident in which there is no criminal scheme, undertaking or intention.

15

...

[T]he person commits aggravated stalking when that person, in violation of a conditional pretrial release, follows or contacts another person at any place other than the defendant's residence without the other person's consent and for the purpose of harassing and intimidating said other person.

Applying the aforementioned principles, we conclude that the trial court abused its discretion by denying the request to charge the jury on the definition of "harassing and intimidating" under the aggravated stalking statute. We first note that Ramos-Garcia's request to charge the jury on "harassing and intimidating" largely tracks the definition of the term as defined in OCGA § 16-5-90(a)(1).[8] Secondly, although the trial court charged the jury on intent and that it had to find that Ramos-Garcia followed Juarez for the purpose of harassing and intimidating her, there is nothing in

[8] Again, OCGA § 16-5-90(a)(1) defines "harassing and intimidating" as

a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

16

the court's instructions that required the jury to find that Ramos-Garcia engaged in a *pattern* of harassing and intimidating behavior, which is an essential element of the crime of aggravated stalking. *Burke*, 287 Ga. at 379.[9] Because the trial court's charge, taken as a whole, failed to instruct the jury that it was required to find that Ramos-Garcia engaged in a pattern of harassing and intimidating behavior, an essential element of aggravated stalking, the trial court abused its discretion by denying Ramos-Garcia's request to charge. See *Burley*, 316 Ga. at 804–05 (trial court erred in charging the jury on aggravated assault with intent to murder because it did not provide a definition of "intent to murder," which is an essential element of the charge).

We reject the State's argument that the trial court did not err by denying Ramos-Garcia's request because the words "harassing and intimidating" are self-explanatory. It is true that

> when the charge embraces a section of the Code which contains technical
> words or expressions, the meaning of which is probably not understood

---

[9] Although a trial court's jury instructions do not have to be identical to the pattern jury instructions, *Showers v. State*, 353 Ga. App. 754, 760(2)(b)(ii) (839 SE2d 245) (2020), we note that the trial court's instructions here did not track the pattern jury instructions for aggravated stalking, which contain the meaning of "harassing and intimidating" as contained in OCGA § 16-5-90(a)(1). See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.24.55 (4th ed. 2007).

by a person unlearned in the law, the court should so define them as to convey to the jury a correct idea of their meaning, but it is unnecessary for the court, even upon request, to explain words and expressions which are of ordinary understanding and self-explanatory.

*Weyer v. State*, 333 Ga. App. 706, 714–15(2) (776 SE2d 304) (2015). Under this rule, we held that "the words 'harassing and intimidating,' as used in OCGA § 16-5-91, are not words of art but rather are words of common understanding and meaning which require no definition themselves for understanding by the jury." *Hollis v. State*, 295 Ga. App. 529, 533(2) (672 SE2d 487) (2009) (citation modified). But *Hollis* is inapposite, and the State's reliance on it is misplaced. In *Hollis*, the defendant argued in part that the trial court erred in its instructions to the jury because the jury could not determine the meaning of "harassing and intimidating." *Hollis*, 295 Ga. App. at 532(2). In response to that argument, we held that the terms "harassing and intimidating" were of ordinary understanding and self-explanatory, and thus a jury did not need to be instructed on their meaning because a jury could conclude for itself what constitutes "harassing and intimidating" behavior. Id. at 533(2). But *Hollis* did not address the argument Ramos-Garcia asserts on appeal, that is, that the trial court failed to instruct the jury on an essential element, which is that he engaged in a *pattern*

18

of harassing and intimidating behavior. And we cannot say that the common, ordinary understanding of the terms "harassing and intimidating" necessarily includes an inference that there is a pattern of harassing and intimidating behavior. Thus, *Hollis* is not controlling here, and it provides no basis to affirm the trial court's denial of Ramos-Garcia's request for the jury instruction.

We further conclude that the error in denying the request was not harmless. See *Rouse v. State*, 373 Ga. App. 838, 845–46 (4) (b) (i) (910 SE2d 245) (2024) (applying the harmless error test to the defendant's claim that the trial court erred by denying his request to charge the jury). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Campbell v. State*, 320 Ga. 333, 343 (3) (b) (907 SE2d 871) (2024). Although we concluded above in Division 1 (b) that the evidence was sufficient to sustain Ramos-Garcia's conviction for aggravated stalking, in reviewing the record de novo and weighing the evidence as we would expect reasonable jurors to have done, we cannot say that it is highly probable that the error did not contribute to the verdict because the evidence was not

19

overwhelming. Indeed, at trial, Juarez recanted her statements that she made on the 911 call that a man was hitting her and following her, and she testified that she was drunk and simply went to her cousin's house and later went to La Oaxaquena and that Ramos-Garcia was with them at some point. The cousin who called 911 did not testify at trial,[10] and although Starks witnessed Ramos-Garcia drag Juarez in the parking lot, he did not witness any of the events before that point. Thus, although the evidence was sufficient for the aggravated stalking offense, we cannot say based on this record that the evidence was overwhelming such that the error in the jury instructions did not contribute to the verdict. Therefore, we must reverse Ramos-Garcia's conviction for this offense. See *Rouse*, 373 Ga. App. at 846(4)(b)(i) (reversing the defendant's conviction based on an error in the jury instructions which was harmful because the evidence of the defendant's guilt was not overwhelming). But "because the evidence was sufficient to sustain the conviction [for aggravated stalking], the State may retry [Ramos-Garcia] on Count [3] without violating the Double Jeopardy Clause." Id.

In sum, we affirm Ramos-Garcia's convictions for false imprisonment and battery, family violence. However, because the trial court committed reversible error

---

[10] Although Juarez's cousin called 911, the evidence in the record does not show that the cousin made any statements to the 911 dispatcher.

20

by denying Ramos-Garcia's request to charge the jury on the aggravated stalking offense, we reverse his conviction for that offense and we remand the case for a new trial on that charge.

*Judgment affirmed in part, reversed in part, and case remanded with direction. Doyle, P. J., and Senior Judge C. Andrew Fuller concur.*